**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBIN MORROW,                )
                               )
         Plaintiff,       )
                               )     02:  09-cv-00744
        v.                   )
                               )
VERIZON PENNSYLVANIA, INC.,    )
                               )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER OF COURT

Presently before the Court is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant Verizon Pennsylvania, Inc. (Document Nos. 45 and 46), the BRIEF IN OPPOSITION filed by Plaintiff, Robin Morrow (Document No. 51), and the REPLY BRIEF filed by Defendant Verizon Pennsylvania, Inc. (Document No. 57).

The issues have been fully briefed and the factual record has been thoroughly developed via the Concise Statement of Material Facts filed by Defendant (Document No. 47), the Appendix in Support of Defendant's Motion for Summary Judgment (Document No. 48), the Response filed by Plaintiff (Document No. 52), the Counter-Statement of Material Facts filed by Plaintiff (Document No. 52), the Appendix to Plaintiff's Counter-Statement of Material Facts (Document No. 54), and the Response to Plaintiff's Counter Statement of Material Facts filed by Defendant (Document No. 58).

After careful consideration of the motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Robin Morrow.   Therefore, for the reasons that follow, Defendant's Motion for Summary Judgment will be granted in its entirety.

**Procedural History**

Plaintiff, Robin Morrow, initiated this lawsuit on June 10, 2009, by the filing of a Complaint in which she asserts claims against Defendant, Verizon Pennsylvania, Inc., ("Verizon") for allegedly violating her rights to be free of retaliation, discrimination, and interference under the Family Medical Leave Act, 29 U.S.C. §§ 2615(a)(2) and (a)(1) ("FMLA").

Verizon filed the instant motion for summary judgment, in which it contends that Plaintiff is not able to establish a *prima facie* case on her claims. In the alternative, Verizon argues that Plaintiff's employment was terminated for legitimate, nondiscriminatory reasons, namely that Plaintiff violated Verizon's Code of Conduct by adding services and upgrades to customer accounts without permission.

**Factual Background**

As the law requires, all disputed facts and inferences are to be viewed in the light most favorable to Plaintiff. The pertinent facts are as follows:

A.     Verizon Incoming Customer Sales and Service Consultants

The responsibilities of a Verizon Incoming Customer Sales and Service Consultant ("consultant") include, *inter alia*, taking calls from customers, as well as selling Verizon products, such as telephone service, internet service, and FIOS television service to both new and existing customers. In addition to a base salary, consultants receive commission based on customer sales; however, in order for the consultant to receive the commission, the customer must have the service installed and activated. If the service is cancelled before activation or installation, the consultant will not receive the commission. Consultants are also eligible for

daily incentives based on sales.  Incentives include cash, gift cards, and points that can be

redeemed on the internal Verizon shopping system.


B.      The Verizon Sales Process

Section 3.1.1 of the 2008 Verizon Code of Conduct  provides, in relevant part, as follows:

### 3.1.1 CREATE ACCURATE RECORDS

* * *

You must create accurate records that reflect the true nature of the
transactions and activities that they record (including the reporting
of time and documenting attendance and absence).  You must
resolve discrepancies in any records and make appropriate
corrections.  If you suspect or learn that records are misleading or
contain errors, you must promptly inform your supervisor and, if
applicable, customers and business providers.  Because even a
minor error can affect the truthfulness of a record, you must report
all errors, regardless of their size or how long ago they may have
occurred.

Verizon does not tolerate falsification or improper alteration of
records.

Verizon Code of Conduct, 2008 version.

An earlier version of the Code of Conduct included a similar provision, which provided:

**Working with Records**

We will prepare company records completely, accurately and
truthfully.  We should apply the highest standards in accurately
recording (or reconciling known) data discrepancies for each
transaction to make correct and timely entries and postings so that
all data elements mirror physical assets.  We will not knowingly
prepare, maintain or provide false or misleading records or data.
We will not knowingly suppress relevant information in any
company record or system.

Consultants must obtain customer approval prior to adding any service or product to a customer's account. Therefore, if a consultant places an order on a customer's account without first obtaining the customer's approval, that consultant would be in violation of Verizon's Code of Conduct. Further, a consultant is required to "recap" a customer at the end of a conversation, which means that the consultant must confirm any services or products the customer has ordered and explain the costs and billing information relative to those services or products.

According to the summary judgment record, there is no progressive discipline for a violation of sales integrity. *See* Depo. of Copeland, at 68.

C.   FMLA Requests and Other Leaves of Absence

At Verizon, FMLA requests are reviewed and approved or denied by the Verizon Absence Reporting Center ("ARC") located in Valhalla, New York. An employee's supervisors are not involved in the administration of FMLA leave.

Susan D. Nelson ("Nelson") is the Verizon Absence Administrator in Pittsburgh. She does not have any responsibility for approving or denying employees requests for absences. Rather, she gathers the information from an employee about a requested absence and forwards that information on to ARC in New York. *See* Nelson Depo. at 19. Nelson reports to a different management chain than the management chain of the consultants. Therefore, if necessary, she would talk to her management about an employee's absence, she would not talk to that employee's management about their absence. *Id*. at 36-37. It is not disputed that Nelson was not involved in any way in the decision to terminate Plaintiff's employment.

D.   Plaintiff's Employment With Verizon

Plaintiff was employed by Verizon as an internal consultant from January 14, 2006, until her employment was terminated on November 7, 2008.   During her employment with Verizon, Plaintiff requested and received her full twelve (12) weeks of FMLA leave in both 2007 and 2008.   Following each leave, Plaintiff was returned to the same job with the same pay and benefits.

At various times during her employment with Verizon, Plaintiff reported to the following first-level supervisors, also known as Team Leaders:  Alyssa LNU, Carrie Cross, and Symone Copeland ("Copeland").  Rori Ann Broggi ("Broggi") was Plaintiff's second level supervisor at all times during her employment.  Broggi testified that she has a group of first-level supervisors that report to her, and then she "has a call center with roughly 200 reps that handle incoming calls."  Broggi Depo. at 12.

Plaintiff contends that her termination was due to her continued need for FMLA leave and in retaliation for her protected activity of complaining to the United States Department of Labor about Verizon's practices.  It is undisputed that Broggi and Copeland were the only two people who made the decision to terminate Plaintiff's employment.

1.   *Employment During 2007*

As a result of an injury sustained in 1997 while working in a nursing home, Plaintiff suffers from a herniated disc, arthritis, and muscle spasms in her back.  In January 2007, upon her one year anniversary of employment with Verizon, Plaintiff requested and received FMLA leave due to her back pain.  According to Plaintiff, when she initially requested the FMLA leave in January 2007, Susan Nelson, Verizon's Absence Administrator in Pittsburgh, commented that

it was convenient that Plaintiff had a disability or FMLA condition the day that she became covered to take FMLA leave.   Nelson testified that the reason she made this comment was because Plaintiff had a good attendance record and was asking if there were things Plaintiff had previously done which helped her condition.

In March 2007, Plaintiff's physician signed an FMLA certification which indicated that Plaintiff needed leave due to her back pain and stated that the "period of incapacity" was from February 23, 2007, through May 23, 2007.  The FMLA certification did not indicate that intermittent leave was needed.

Plaintiff took time off in February and March 2007 pursuant to that FMLA certification. She returned to work on March 23, 2007, but was absent again on March 28, 2007.  This absence was coded by ARC as an unapproved absence because there was no intermittent leave certification on file.  As a result of Plaintiff's "unauthorized" absence, she was suspended without pay for three days.   On May 7, 2007, Plaintiff filed with Verizon an appeal of the denial for intermittent leave in which she contended that she was under the impression that she did not need additional FMLA forms because she believed that the FMLA certification for back pain covered intermittent absences.  After her appeal was denied, Plaintiff  informed Nelson that she would be calling the United States Department of Labor ("DOL") because the issue was not resolved through the Union grievance process.  In July 2007 Plaintiff filed a complaint with the DOL regarding her three-day suspension.

In June 2007, Broggi asked Plaintiff to train in Verizon's Fiber Department.  Plaintiff declined and specifically told Broggi that she felt that she could not handle the Fiber training at that time because she had a number of doctor's appointments and was on a lot of medication. Plaintiff also told Broggi that she was taking time off for back surgery.  Broggi testified in her

deposition that she assumed Plaintiff's leave was covered under the FMLA, but Plaintiff did not reference the FMLA during this conversation.

On September 24, 2007, Nelson sent an email to Elizabeth Mears, on which Rori Broggi and others were copied. The subject line was "AMTS problems." Nelson sought assistance from Mears with respect to the problems "with AMTS not coding properly when the approvals or denials come through." In the email, Nelson specifically discussed Plaintiff's situation, as follows:

> This is one that I urgently need an answer on or to be worked. Robin Morrow's attendance is recently INCREASED to at 28.76% and she has been in contact with the union, labor and relations board and lawyers trying to save her job since she knows what is due to come. However, with the delays, I am now concerned how tight our case is going to be for terminating her.

> This is an employee who I can terminate IF I could get 4.4 more days approved, the rest would default to denials since she is out of FLMA. The problem is that AMTS is not updating the approvals, nor is it generating the paperwork for the recertifications. As you can see, she clearly has more than 4.4 days pending and they go back to April. I have been continuously in contact with ARC, who had previously advised me the paperwork went out. . . .

> Today when I spoke with Ensley at ARC, he advised me the recertification paperwork was not generated! He also did advise part of the reason that the days are coming in as approved for 1 day her (sic) and there based on how the doctor is filling out the paperwork. . . .

Pl. Exh. 19.

Nelson explained in her deposition that she did not want to terminate Plaintiff's employment and sent the email because Plaintiff, at that time, had more pending absences than she had FMLA days available to her, and Nelson did not know the status of the pending requests. According to Nelson, ARC had been taking a long period of time to approve or deny absences

and she wanted to "ensure that everything is the way it's supposed to be before I do any type of discipline." Nelson Depo. at 82.

Broggi testified that she did not recall seeing the September 2007 email from Nelson, and that she would not have read the email because the subject was "AMTS problems" and that issue would not pertain to her.

Plaintiff also argues that she was subjected to antagonistic comments on November 5, 2007, made by Michael Billups ("Billups"), the director of consumer sales in Pennsylvania and Delaware, during her second formal grievance regarding her three-day suspension. Specifically. Billups noted during the grievance that Plaintiff had missed 73 days of work so far that year. Billups testified in his deposition that the reason he noted the number of days Plaintiff had missed was because it showed that "she was not dependable." Billups further testified that even if any of those 73 days that Plaintiff had missed were covered by the FMLA, that would not change his statement that she was not dependable.

On December 3, 2007, the DOL notified Verizon's ARC that it had received complaints from eight (8) employees "concerning Verizon/ARC processing of requests for intermittent leave under the Family and Medical Leave (FMLA). . . ." Among the specific complaints brought to Verizon's attention was the following made by Robin Morrow:

> Morrow states that [Susan Nelson, the Absence Administrator] is coding all absences as new absences. This is apparently the result of Morrow's confusion concerning the necessity of Sections B and C of the medical certification in determining intermittent FML. Consequently, Morrow's physician was completing the medical certifications indicating the need for leave for specific blocks of incapacity instead of prospective intermittent periods of leave.
>
> Morrow did not submit a medical cert for [3/28/07] because she thought this was included in one covering 2/23/07 through 5/23/07. At this point Morrow was not aware that her medical certifications were for specific blocks of time and not for intermittent leave. She

> filed an administrative review request and provided a medical cert.
> Her denial letter indicated that she had until 5/7/07 to provide the
> required documentation.  Her appeal was denied because she did
> not submit her medical cert until 5/7/07.
>
> . . . .
>
> It should be noted that in August, 2007 Morrow's physician, Dr.
> Jeffrey Hein, received a call from Dr. Hart at ARC.  Dr. Hart
> instructed Dr. Hein on how to properly fill out the medical cert
> regarding frequency and duration of absences and to indicate that
> the condition was for 12 months . . . .

Appendix to Pl's Counter Statement, Exh. 21.  On March 31, 2008, Verizon ARC notified the

DOL that it had reviewed Morrow's submissions for her 3/28/07 absence and had concluded that

the documentation provided by Morrow "was sufficient to approve FMLA leave for the absence.

The denial will be overturned and her attendance discipline adjusted accordingly."  *Id.* at Exh.

22.  The decision to rescind Plaintiff's three-day suspension and to pay her for those days was

relayed from Lisa Birkdale, Esquire (Verizon Legal Department) to  Cindy Marinari (Senior

Staff Consultant, Labor Relations, in Philadelphia) to Susan  Nelson in Pittsburgh.

Plaintiff testified that during her employment, she often assisted other Verizon employees

with FMLA issues by advising them on completing  FMLA paperwork, giving them the DOL

phone number, and posting flyers on the bulletin board.  She further testified that she advised

other Verizon employees to contact the DOL if they had discipline issues related to FMLA leave.

Plaintiff testified, however, that she never told anyone in Verizon management about the alleged

FMLA assistance she provided to Verizon co-workers.

Plaintiff requested and received her full 12 weeks of FMLA leave in 2007.

2.    *Employment During 2008*

In 2008, Plaintiff again requested and received her full 12 weeks of FMLA leave.[1]  She also took short-term disability leave from February 12, 2008 until August 12, 2008.[2]  In July 2008, while she was out on short-term disability, Plaintiff underwent two surgeries related to her back injury.  MetLife, Verizon's short-term disability carrier, sends a notification to the employee's supervisor regarding any disability claim.  The supervisor then forwards the notification to the Absence Administrator.  The notification from MetLife makes no reference to the FMLA or the employee's condition.  *See* Pl's Exh. 20.   Copeland received numerous emails from MetLife pertaining to Morrow's short term disability leave, all of which she forwarded to Susan Nelson.

Plaintiff returned to work on August 13, 2008.  Upon her return, Copeland asked her if everything was okay and Plaintiff responded that she had to start seeing a hematologist.

In the Fall of 2008, Plaintiff's managers, Broggi and Copeland, noticed that Plaintiff had extremely high sales with very low call volume.   On November 4, 2008, Copeland began to investigate Plaintiff's sales activity.  On November 6, 2008, Copeland observed Plaintiff during a call with a customer ("Customer No. 1") and listened to the call.  Plaintiff was not aware that Copeland was observing the call.

---

[1]  The summary judgment record does not reflect the period of time for the 2008 requested FMLA leave.

[2]  While Plaintiff was out on short-term disability, she received a phone call from Nelson advising her that Verizon would be correcting the three-day suspension as a result of the DOL's investigation.  Plaintiff testified that during this phone call, Nelson told Plaintiff that she was "lucky that it happened that way because I probably would have got terminated because I might have exceeded my dates, my time of FLMA."  Pl. Depo. at 81.

After confirming that Plaintiff had placed an order and added video to Customer No. 1's account, Copeland called the customer who confirmed that he had not authorized Plaintiff to place the order. He explained that he had a contract with another provider and wanted to check with his wife before adding video service.

On the same day, other customers also reported that Plaintiff had added services to their accounts without authorization. Verizon Supervisor Kevin Baden spoke to a customer ("Customer No. 2") who complained that Plaintiff had ordered services to be installed at a previous address without her approval. A third customer also spoke with Baden ("Customer No. 3) and reported that he had been on vacation and returned to a voicemail which informed him that Verizon was coming to dig up his yard for FIOS installation, but that he had not ordered FIOS.[3]

Copeland, on November 6, 2008, at approximately 5:00 pm., called Plaintiff in to her office and advised her that she was being suspended pending an investigation because three (3) customers had called in and complained that Plaintiff had added services to their accounts without their permission. During that meeting, Plaintiff was not provided with anything in writing, but Copeland informed Plaintiff that she would later be provided with an Employee Contact Sheet.

The next day, November 7, 2008, a customer called questioning her bill. Copeland discovered that Plaintiff had added upgrades to the customer's account without the customer's

---

[3] In an email dated November 6, 2008, at 5:14 p.m., after Morrow had been suspended, Baden notified Copeland that the customer allegedly did not agree to television service and that the order for television needed to be cancelled. During his deposition, Baden admitted that there was no entry reflecting an order for television on that particular exhibit shown to him.

authorization.  Specifically, Plaintiff had used a $10 promotion for customers in Pennsylvania and Delaware when the promotion was not available in those states.

Thereafter, Copeland and Broggi made the decision to terminate Plaintiff's employment with Verizon.  At 10:54 a.m., on November 7, 2008, Copeland called Plaintiff and asked her to come in to Verizon at 2:00 PM to discuss what had occurred the previous day.  During the meeting, Copeland informed Plaintiff that she was being discharged for adding services to customer accounts without permission in violation of Verizon's Code of Conduct.  Copeland testified that "[t]here were eight customers that had Extreme High Definition bundle upgrades added to their accounts without their knowledge. . . Customers started receiving their bill, calling back in."

Although the Union initially filed a grievance over Plaintiff's discharge, it subsequently chose not to take the grievance to arbitration.  In a letter to Plaintiff, the Union explained:

> After careful review, the Union does not find sufficient reason to pursue the matter further.  Therefore, this grievance is closed. Verizon maintains a strict policy against improper sales practices . . . In your case, Verizon accused you of placing services on customers' accounts without their knowledge. It has provided the Union with sufficient documentation and evidence to support this accusation.

### Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). The court is not to weigh the evidence, or make credibility decisions about the evidence.

*Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993). "A defendant moving

for summary judgment bears the initial burden of demonstrating there are no facts supporting the

plaintiff's claim; then the plaintiff must introduce specific, affirmative evidence there is a

genuine issue for trial." *Holt Cargo Sys., Inc. v. Del. River Port Auth.*, 20 F. Supp.2d 803, 817

(E.D. Pa. 1998), *aff'd,* 165 F.3d 242 (3d Cir. 1999)).

Additionally, as the moving party, the defendant, is not required to refute the essential

elements of the plaintiff's cause of action. Rather, the defendant need only demonstrate "the

absence or insufficiency of the plaintiff's evidence offered in support of those essential elements.

*See Celotex*, 477 U.S. at 322-23 (1986). Further, the non-moving party cannot rely on

unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a

summary judgment motion. Distilled to its essence, the summary judgment standard requires

the non-moving party to create a "sufficient disagreement to require submission [of the evidence]

to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Under Rule 56, the Court must view the evidence presented on the motion in the light

most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. The non-movant's

evidence is to be believed, and all justifiable inferences are to be drawn in the non-movant's

favor. *Id.* Further, credibility determinations, weighing of evidence, and drawing of legitimate

inferences from the facts are jury functions, not those of a judge. *Id.* Notably, the Court should

not consider the record in piecemeal fashion, giving credence to innocent explanations for

individual evidence, because a jury would be entitled to view the evidence as a whole. See

*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 285 (3d Cir. 2001).

The task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory or retaliatory purpose. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 525 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

## Discussion

"The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.' " *Callison v City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (quoting 29 U.S.C. §§ 2601(b)(1) and (2)). There are two types of claims an employee can bring against an employer under the FMLA. First, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). A claim arising under this provision is known as an "interference" claim. *Callison*, 430 F.3d at 119.

Second, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). A claim under this provision is referred to as a "retaliation" or a "discrimination" claim. *Callison*, 430 F.3d at 119. The United States Court of Appeals for the Third Circuit has clarified that an employee alleging a discharge in violation of the FLMA may proceed under both theories of recovery. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) (holding that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.")

A.    **Retaliation and Discrimination Claims**

Retaliation and discrimination claims under the FMLA are analyzed under the now-familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first make out a *prima facie* case of retaliation / discrimination.  After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the employer provides a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to establish that the employer's reason was pretext for retaliatory or discriminatory animus.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

1.  *Prima Facie Case*

Plaintiff contends that Verizon terminated her employment in order to retaliate and/or discriminate against her due to her protected FMLA activities, i.e., (i) the use of FMLA leave; (ii) the filing of a DOL complaint; and /or (iii) the alleged FMLA assistance she provided to her co-workers.

To establish a *prima facie* case of retaliation and/or discrimination under the FMLA, a plaintiff must satisfy three (3) elements:  (i) she asserted FMLA rights,  (ii) she suffered an adverse employment decision; and (iii) the adverse decision was causally related to her leave. *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 508-509 (3d Cir. 2009); *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).  Neither party disputes that Plaintiff asserted her rights under the FMLA nor do the parties dispute that Plaintiff suffered an adverse employment decision when her employment was terminated.  Therefore, the Court must determine whether the evidence before it demonstrates that, when examined in the light  most

favorable to Plaintiff, a reasonable factfinder could find that the November 2008 decision made by Broggi and Copeland to terminate Plaintiff's employment was causally related to (i) her use of FLMA leave; (ii) her 2007 DOL complaint; and/or (iii) her alleged FMLA assistance to co-workers.

Plaintiff argues that the summary judgment record evidence establishes that there exists a causal connection between her protected activity and the decision to terminate her employment in that (i) the decision makers had notice of Plaintiff's use of FLMA leave; (ii) the temporal proximity between her protected activity and her termination; (iii) evidence of ongoing antagonism and (iv) evidence of pretext. Plaintiff's arguments will be addressed seriatim.

      a.    <u>Whether Broggi Had Notice of Plaintiff's Use of FMLA Leave</u>

Plaintiff testified that in June of 2007, more than one year before Plaintiff's discharge, Broggi asked her to participate in "fiber training, and at that time I declined, because I advised her of my condition and didn't feel I'd be able to handle the training at that time." Pl. Depo. at 50. Broggi testified that Plaintiff had told her that she was "going out" for back surgery and Broggi assumed that would be covered by FMLA, but the term FMLA never came up during the conversation. Neither Plaintiff nor anyone from Verizon ever told Broggi that Plaintiff was approved to take FMLA leave.

The Court finds that this single conversation, which did not include any mention of leave under the FMLA and which occurred more than a year before Plaintiff's discharge, fails to establish a causal connection between Plaintiff's use of FMLA leave and Broggi's decision to terminate Plaintiff's employment. Accordingly, the Court finds that this one conversation did not provide Broggi with any knowledge of Plaintiff's use of FMLA leave.

b.      Whether Copeland had Notice of Plaintiff's Use of FMLA Leave

The sole conversation Plaintiff relies upon with Ms. Copeland occurred upon Plaintiff's return from short-term disability leave in August of 2008. Ms. Copeland asked if Plaintiff was okay and Plaintiff responded that she had "to start seeing a hematologist." Pl. Depo. at 76. Plaintiff testified that Copeland was neither angry nor upset and simply asked how Plaintiff was doing. The Court finds that knowledge of Plaintiff's leave cannot be imputed to Copeland based upon this single conversation, which did not include any mention of leave under the FMLA.

Plaintiff also argues that the short-term disability notifications received by Copeland from MetLife reflect notice to Copeland of Plaintiff's use of FMLA leave. The Court finds this argument to be wholly without merit. The notifications from MetLife to Verizon make no mention of the FMLA and notably state that "MetLife has received a disability claim . . . ." It is not disputed that MetLife was Verizon's short-term disability carrier and it is fundamental that short-term disability leave is not synonymous with FMLA leave. For these reasons, the Court finds that the short-term disability notifications that Copeland received from MetLife did not provide Copeland with notice of Plaintiff's use of FMLA leave.

For these reasons, the Court finds that the summary judgment record is void of any evidence from which a reasonable factfinder could conclude that Copeland had knowledge of Plaintiff's use of FMLA leave.

c.      The 2007 DOL Complaint

The summary judgment reflects that the DOL complaint filed by Plaintiff was handled exclusively by Verizon's Absence Reporting Center and its Legal Department. Broggi testified as follows:

> Q:     Did you become aware at any time that Robin Morrow had filed a complaint with the Department of Labor about alleged violations of Verizon's conduct to the FMLA?
>
> A:     No.

Copeland similarly testified:

> Q:  Did you become aware at any time that Robin Morrow filed a complaint with the Department of Labor against Verizon?
>
> A:  No.

Plaintiff, by her own admission, does not know if either Broggi or Copeland was aware of the fact that she had filed a Complaint with the DOL.  Plaintiff testified:

> Q:     Do you know if Ms. Copeland was aware of the fact that you had filed a complaint with the Department of Labor?
>
> A:     I don't know.
>
> Q:     Do you know if Ms. Broggi was aware of the fact that you had filed a Department of Labor complaint?
>
> A:     I don't know.

The Court finds that Plaintiff has failed to adduce any evidence from which a reasonable factfinder could conclude that Copeland had any knowledge that Plaintiff had filed a DOL complaint.

The issue of whether Broggi had knowledge of the filing of the DOL complaint is a closer call.   It is not disputed that in September 2007 Nelson sent an email, the subject of which was "ATMS problems" and Broggi was included on the distribution list.   The email states that Plaintiff has been in contact with "the union, labor and relations board and lawyers trying to save her job since she knows what is due to come." (emphasis added.)  Broggi testified that she

did not recall seeing this email and, even if she had seen it, she would not have reviewed it as she is not involved with ATMS issues or problems.

However, at this stage of the litigation, the evidence must be viewed in the light most favorable to Plaintiff. Therefore, the Court will accept Plaintiff's proposition, for the purpose of this Memorandum Opinion only, that Broggi received and read the email. However, the Court is not persuaded that the reading of this email creates a causal connection with Broggi's decision over a year later to terminate Plaintiff's employment.

First, the email was sent on September 24, 2007. By Plaintiff's own admission, the DOL did not contact Verizon until December 3, 2007, more than two months after Nelson sent the email. The record reflects that after Plaintiff's appeal regarding her three-day suspension was denied, Plaintiff told Nelson that she would be contacting the DOL, but the record is devoid of any evidence that Plaintiff confirmed to Nelson that she had in fact contacted the DOL or that Nelson relayed any of this information to Broggi.

Next, the email does not refer to the DOL, but rather refers to the "labor and relations board." Again, the email could not have been referring to Plaintiff's complaint filed with the DOL as Verizon did not become aware of the DOL complaint until December 3, 2007.

Finally, the email was sent on September 24, 2007, more than fourteen (14) months prior to Plaintiff's termination. The Court finds that this time frame is simply too long to create any inference of causation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274-74 (2001) (citing cases where three or four months was too long); *EEOC v. Yellow Freight Sys.*, Inc., 253 F.3d 943, 952-53 (7th Cir. 2001) (six weeks too long); *Wallace v. United Parcel Serv.*, No. 02-1685, 2006 WL 1806404 (D.N.J. June 29, 2006) (two months insufficient), *aff'd*, No. 07-2336, 2007 WL 2988582 (3d Cir. 2007).

Accordingly, the Court finds and rules that Plaintiff has failed to establish a causal connection between the filing of her DOL complaint and the decision of Broggi and Copeland to terminate her employment.

### d. FMLA Assistance to Co-Workers

The record is completely devoid of any evidence which reflects that anyone in Verizon management, including Broggi and/or Copeland, knew of Plaintiff's alleged FMLA assistance to her co-workers. Both Broggi and Copeland testified in their depositions that no one had ever informed them that Plaintiff had been discussing with other employees their rights under the FMLA.

When asked to identify what "assistance" she provided to her co-workers, Plaintiff testified that she assisted a co-worker named "Mike" (whose last name she could not recall) by providing him with the number for the DOL and assisted co-worker Marla Boyd by helping her with FMLA paperwork. *See* Pl. Depo. at 99-100. Plaintiff also testified that she never told anyone in Verizon management about the alleged FMLA assistance which she provided to co-workers.

Thus, the Court finds and rules that Plaintiff has failed to present any evidence from which a reasonable factfinder could conclude that the decision to terminate Plaintiff's employment was causally related to Plaintiff's FMLA-related activities with co-workers.

### e. Evidence of Antagonism

As evidence of antagonism, Plaintiff relies upon one comment made by Director for Consumer Sales Michael Billips, one comment made by Nelson, and the September 2007 email sent by Nelson. The comment by Billips was made during Plaintiff's grievance proceeding on November 5, 2007, when he noted that Plaintiff had missed 73 days of work so far

that year. The comment by Nelson was made in 2007 when Plaintiff first became eligible for FMLA leave and Nelson commented that it was "convenient" that Morrow had a disability or an FMLA condition on the day that she became eligible to take FMLA leave. The September 24, 2007, email sent by Nelson has been discussed at length *supra*.

Strikingly, however, Plaintiff has proffered no evidence whatsoever which demonstrates antagonism by or from Broggi and/or Copeland, the decision makers in this case. In fact, Plaintiff testified that both Broggi and Copeland were complimentary and helpful to her following her return from leave in August 2008. For example, Plaintiff testified that Broggi and Copeland both sent encouraging notes to her with regard to her performance following her return from leave. Additionally, Plaintiff testified that Copeland gave her "leads" for outbound calls to increase her sales.

    f.   <u>Conclusion</u>

For all these reasons, the Court finds and rules that the summary judgment evidence before it does not demonstrate that the November 2008 decision made by Broggi and Copeland to terminate Plaintiff's employment was causally related to (i) her use of FLMA leave; (ii) her 2007 DOL complaint; and/or (iii) her alleged FMLA assistance to co-workers. Thus, Plaintiff has failed to meet her *prima facie* case and summary judgment will be granted as to Plaintiff's claims of FMLA retaliation and/or discrimination

    2.   <u>Pretext of Discrimination</u>

However, assuming *arguendo* that Plaintiff had established a *prima facie* case of discrimination /retaliation, the Court would nevertheless grant summary judgment because the Court finds and rules that Plaintiff has failed to adduce any evidence from which a reasonable

factfinder could (i) disbelieve Defendant's articulated nondiscriminatory reasons or (2) otherwise believe that an invidious discriminatory reason was more than not a motivating or determinative cause for Defendant's decision to terminate Plaintiff's employment. *See Fuentes,* 32 F.3d at 764.

In this case, Verizon has met its burden of providing legitimate, nondiscriminatory reasons for its termination of Plaintiff's employment, namely that she violated Verizon's Code of Conduct. Verizon has produced extensive and documented evidence of Plaintiff's misconduct. The burden then shifts back to Plaintiff to demonstrate sufficient evidence of pretext to meet her burden at summary judgment. *Fuentes,* 32 F.3d 764.

Plaintiff contends that a genuine issue of material fact exists because "Verizon's reasons for terminating Morrow are not worthy of belief." Pl's Memo. at 10. To refute an employer's articulated reason, the plaintiff must submit "reasonable, specific evidence" that the employer's proffered reason is untrue. *Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997). A plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Id.* at 1109.

First, Plaintiff denies her misconduct contending that she never placed an order for a customer or sold any service to a customer when the customer did not give her permission to do so. However, it is well settled that an employer need not be correct – only that it believed that the act giving rise to the termination did occur and that it relied on that belief for its decision. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[N]o matter how mistaken the firm's managers . . . our inquiry is limited to whether the employer gave an honest explanation of its behavior.") In this case, interestingly, Plaintiff does not deny <u>all</u> of the alleged misconduct. In fact, she explicitly admitted giving the $10 upgrade promotions to

customers in Pennsylvania and Delaware even though it was not available in those states, but disputes that her discharge was an appropriate sanction.[4]

Next, Plaintiff disputes the sufficiency of Verizon's investigation into her misconduct and contends that Verizon did not conduct its investigation until after her discharge. That allegation, however, is belied by the summary judgment record evidence. Copeland testified that she began investigating Plaintiff's low calls and high sales on November 4, 2008. Further, Copeland testified that she personally overheard a call during which Plaintiff placed an order without customer approval and that she received complaints from other customers about Plaintiff having added services and upgrades to their accounts without approval. The undisputed summary judgment evidence reflects that these events occurred prior to Plaintiff's suspension. The summary judgment record further reflects that the investigation continued after Plaintiff's discharge because additional customers continued to call to complain about Plaintiff's actions.

The Court also finds Plaintiff's last contention that Verizon provided inconsistent reasons for her suspension and discharge to be without merit. Verizon's reasons for Plaintiff's suspension and discharge has remained consistent – she violated Verizon's Code of Conduct by adding services to customer accounts without their permission. Whether Copeland mentioned the telephone call which she personally observed during the November 6, 2008 meeting is of no consequence because Plaintiff was unquestionably apprised of her misconduct.

Conversely, based on the undisputed summary judgment record evidence, the Court finds that Plaintiff has failed to adduce any evidence from which a reasonable factfinder could find that Verizon's real reason for terminating Plaintiff's employment was retaliatory or

---

[4] Plaintiff testified, "I mean, I gave the $10 credit at the 109.99 with the $10 off, so I did give that, and if that was something I did wrong, I should have been coached, maybe suspended for that. I'm not saying that I didn't do that." Pl. Depo. at 170.

23

based on discriminatory animus. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-147 (2000). In order to meet this final burden, Plaintiff cannot merely show that the employer's decision was wrong or mistaken, but must provide evidence from which a reasonable factfinder could infer that each of the reasons proffered by the employer "was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Fuentes,* 32 F.3d at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.*

For the foregoing reasons, the Court concludes that Plaintiff has not raised a genuine issue as to whether Verizon's asserted reason for terminating Plaintiff's employment is mere pretext. Under the evidence presented by both parties, the Court finds that a reasonable factfinder could not rationally conclude that Defendant's articulated reasons for its actions were not credible. "The FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Dillon v. Carlton,* 977 F. Supp. 1155, 1160 (M.D. Fla. 1997), *aff'd,* 161 F.3d 21 (11th Cir. 1998). Thus, Defendant's motion for summary judgment with respect to Plaintiff's FMLA retaliation / discrimination claim will be granted.

B.      **Interference Claims**

Title 29, United States Code, § 2615(a)(1) states: "It shall be unlawful for any employer to interfere with, restrain, or deny the existence of or the attempt to exercise any right provided under [the FMLA.]" "To assert an interference claim, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Sarnowski v. Air Brooke*

*Limousine, Inc.*, 510 F.3d 398, 399 (3d Cir. 2007) (quotation marks omitted). Thus, "the employee need not show that he was treated differently than others, and the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Id.* (quotation marks and alteration omitted). Our appellate court has cautioned that "[a]n interference action is not about discrimination," but instead, is "about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id.*; *Callison v. City of Philadelphia*, 430 F.3d 117, 119-20 (3d Cir. 2005).

In Count I of her Complaint, Plaintiff claims that Verizon interfered with her FMLA rights by "using [her] absences from work for FMLA qualifying leave as a negative factor in its employment actions against her and/or terminating Morrow to interfere with her right to leave." Complaint at ¶ 18. As discussed at length *supra*, the uncontested summary judgment record evidence reflects that Plaintiff's use of FMLA leave had no impact on the decision makers in this case, Broggi and Copeland. Further, Plaintiff testified that neither Broggi nor Copeland did anything to interfere with her use of FMLA time:

> Q: Did Ms. Copeland, in your view, ever interfere with your use of FMLA leave?
>
> A: No.
>
> Q: Did Ms. Broggi ever interfere with your use of FMLA leave?
>
> A: No.

Furthermore, Plaintiff has produced absolutely no evidence to support her allegation that she was discharged to prevent her from taking additional FMLA leave. The undisputed evidence of record reveals that Plaintiff received all the FMLA leave to which she was entitled. The Court finds and rules that Plaintiff has failed to produce any evidence to support her contention that her discharge interfered with her right to FMLA leave.

In addition to her actual termination, Plaintiff contends that Verizon interfered with her FMLA rights and/or or discouraged her from taking FMLA leave on a number of occasions. First, Plaintiff contends that Verizon interfered with her FMLA rights because, for a period of time in 2007, she received FMLA paperwork for each absence she reported. Plaintiff testified, "I'd get a form for any day that I missed or called off as being a new condition, as opposed to being related to my initial condition . . . " Pl. Depo. at 65. The record reveals, however, that the forms were the result of Plaintiff's physician having incorrectly completed the FMLA forms to certify blocks of leave – rather than intermittent leave. In August 2007, an ARC physician called Plaintiff's physician, Dr. Jeffrey Hein, and instructed him on how to properly fill out the medical certifications. Plaintiff confirmed during her deposition that the problem with the forms ceased once her physician certified her for intermittent absences. Pl. Depo. at 69-70.

Next, Plaintiff contends that Verizon interfered with her right to take FMLA leave by suspending her for three (3) days for a March 2007 absence that allegedly should have been covered by the FMLA. The summary judgment record evidence reflects, however, that Verizon's position was based on the paperwork submitted by Plaintiff's physician that indicated an absence for a period of time from February 23, 2007 to May 23, 2007 – he did not check the box on the form which indicated that the leave should have been intermittent. After being contacted by the DOL, Verizon reviewed its determination and rescinded Plaintiff's suspension and paid her for the three days.

As a final example, Plaintiff contends that Nelson discouraged her from taking FMLA leave and, in support, points to two comments made by Nelson. The first Nelson comment occurred in January 2007 when Nelson remarked how convenient it was that Plaintiff had a disability or an FMLA condition the day that she became eligible to take FMLA leave. When

asked during her deposition how this comment interfered with her rights to FMLA leave, Plaintiff testified: "**I felt that, you know, it was saying that I didn't have a medical condition.**" Pl. Depo. at 74 (emphasis added).[5]

Plaintiff described the second comment as follows:

> A: [B]y July of '07, the MRI got approved, so it must have been – I can't remember the exact month, but it's when I initially got approved, and [Nelson] asked what was going on, and I said that I was – my MRI got approved, I'm waiting for that to get approved, and she said that – you know, she asked what insurance I had, and I told her I had Keystone and she said her daughter's – that seemed strange, because her daughter's got approved immediately. You know she didn't know why mine wouldn't have got approved.
>
> Q: What do you consider interfering about that conversation?
>
> A: **Well, I just thought, to me, it seemed like she didn't believe what I said**.
>
>         * * *
>
> Q: Did Ms. Nelson ever tell you that she didn't believe what you were saying?
>
> A: No. That's how I took it.

Pl. Depo. at 75 (emphasis added).

_____

[5] Interestingly, Plaintiff also specifically testified that she was not claiming that Nelson interfered with her FMLA leave:

> Q: Are you claiming that Ms. Nelson, as an individual, Ms. Nelson specifically was a person who interfered with your FMLA leave?
>
> A: No.

Pl. Depo. at 62. Plaintiff further testified that Nelson tried to help her to use FMLA time, was helpful in trying to work through paperwork, and facilitated her FMLA leave. *See* Pl. Depo. at 61-62, 76.

Plaintiff cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Distilled to its essence, the summary judgment standard requires that the non-moving party create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

 In conclusion, the Court finds and rules that Plaintiff's contention that Verizon either interfered or discouraged her from taking FMLA leave is wholly without support in the record. Thus, the motion for summary judgment with respect to Plaintiff's interference claim  will be granted.

### Conclusion

For the reasons hereinabove set forth, the Court finds that Defendant is entitled to summary judgment because Plaintiff has not produced sufficient evidence from which a reasonable factfinder could conclude that Verizon violated her rights to be free from retaliation, discrimination and/or interference under the FMLA.

The Motion for Summary Judgment filed by Defendant, therefore, will be granted in its entirety.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBIN MORROW,                                    )
                                                 )
        Plaintiff,                       )
                                                 )     02:  09-cv-00744
        v.                               )
                                                 )
VERIZON PENNSYLVANIA, INC.,                      )
                                                 )
        Defendant.                       )

**ORDER OF COURT**

     **AND NOW**, this 22nd day of February, 2011, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that the

Motion for Summary Judgment filed by Defendant is **GRANTED** and judgment is hereby

entered in favor of Defendant, Verizon Pennsylvania, Inc., and against Plaintiff, Robin Morrow. .

     The clerk shall docket this case closed.


                        BY THE COURT:

                        s/Terrence F. McVerry
                        United States District Court Judge

cc:    Colleen Ramage Johnston, Esquire
Rothman Gordon, P.C.
Email: crjohnston@rothmangordon.com

Nikki Velisaris Lykos, Esquire
Rothman Gordon, P.C.
Email: nvlykos@rothmangordon.com

Catherine S. Ryan, Esquire
Reed Smith
Email: cryan@reedsmith.com

Kimberly A. Craver, Esquire
Reed Smith, LLP
Email: kcraver@reedsmith.com